IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: _____ |
| | ) | |
| v. | ) | |
| | ) | |
| MARK A. ELLIS, M.D.; PATSY ALLEN; | ) | |
| MARK A. ELLIS, M.D., P.C. d/b/a | ) | **JURY TRIAL** |
| ELLIS PAIN CENTER; | ) | |
| ELLIS PRACTICE MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT OF THE UNITED STATES OF AMERICA

## INTRODUCTION

1.     The United States of America brings this action under the False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "FCA") and common law theories of payment by mistake, unjust enrichment and fraud against Mark A. Ellis, M.D. ("Ellis"); Patsy Allen ("Allen"); Mark A. Ellis, M.D., P.C. d/b/a Ellis Pain Center ("EPC") and Ellis Practice Management, LLC ("EPM") (collectively, the "Defendants") to recover damages suffered as a result of Defendants' unlawful conduct, including the submission of thousands of false claims to Medicare for services that were never rendered and services that were medically unnecessary.  Defendants' actions unjustly enriched their bank accounts at the expense of the United States and the tax-paying public, as set forth in detail below.

2.     Between 2012 and 2015, the Defendants profited tremendously from the implementation of a scheme to submit claims for a pre-set list of urine drug tests for EPC patients on virtually every visit.

3.     Through the use of "shortcuts" in the billing software that was used to submit EPC's claims to Medicare and other payers, EPC, at the direction of Ellis and Allen, automatically entered a list of pre-determined codes for various urine drug tests onto EPC's electronic claim regardless of whether the test was actually conducted, ordered by a clinician or medically necessary.

4.     Indeed, Medicare paid EPC over $7.6 million for confirmation and quantitative drug testing performed from 2012 to 2015.

5.     EPC, at the direction of Ellis and Allen, maintained a practice of numerous patients, most of whom were prescribed opioids by Ellis.  These patients were required to come into the office on a monthly basis where they were subject to a battery of unnecessary, excessive and expensive routine testing without any medical justification.  Patients were generally given 10 minute time slots, during which they were evaluated by a physician's assistant or medical assistant, directed to undergo unnecessary testing and then prescribed their opioid by Ellis.  Patients who took up more than the allotted 10 minutes were referred to internally as "problem" patients.

6.     In order to implement this scheme, EPC, at the direction of Ellis and Allen, set up standing orders for testing to be conducted on their patients without regard to each patient's individual signs, symptoms, complaints or medical history. In many cases, EPC failed to incorporate the results of these tests into their patients' respective plans of care, a fact that underscores the lack of medical necessity for these claims.

7.     Medicare paid EPC over $800,000.00 for the ancillary testing performed from 2012 to 2015.

8.      Each Defendant was unjustly enriched as a result of the fraudulent billing schemes for which Ellis, Allen and EPC wrongfully obtained money from the United States and their knowing retention of such monetary benefits would be inequitable under these circumstances.

## JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 1367(a).

10.     Under 31 U.S.C. § 3732(a), the Court has personal jurisdiction over Ellis because he resides, has transacted business and has committed acts in violation of the FCA in this District.

11.     Under 31 U.S.C. § 3732(a), the Court has personal jurisdiction over Allen because she has transacted business in this District and because a substantial part of the events and omissions giving rise to the claims alleged occurred in this District.

12.     Under 31 U.S.C. § 3732(a), the Court has personal jurisdiction over EPC because its principal office is located in this District, and it has transacted business in this District and because a substantial part of the events and omissions giving rise to the claims alleged occurred in this District.

13.     Under 31 U.S.C. § 3732(a), the Court has personal jurisdiction over EPM because its principal office is located in this District and it has transacted business in this District and because a substantial part of the events and omissions giving rise to the claims alleged occurred in this District.

14.     Venue is proper in the Middle District of Georgia pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), because all Defendants reside in or operate in Clarke County, Georgia and because a substantial part of the events and omissions giving rise to the claims alleged occurred in this District.

**PARTIES**

15.     The United States brings this action on behalf of the United States Department of Health and Human Services ("HHS") and its operating division, the Centers for Medicare & Medicaid Services ("CMS"), which administers the Medicare program for HHS.

16.     At all times relevant to the Complaint, Ellis was a licensed physician engaged in the practice of pain management in the State of Georgia, doing business at 1500 Langford Drive, Building 200, Watkinsville, GA 30677, during which he has treated patients covered by the Medicare program ("Medicare beneficiaries"). Ellis is and has been the sole owner of EPC since its inception in 2001 and is and has been one of the owners of EPM since its inception in 2008. Ellis resides in Athens, Georgia.

17.     At all times relevant to the Complaint, Allen has been the Practice Administrator of EPC and has had managerial control of EPC, which does business at 1500 Langford Drive, Building 200, Watkinsville, GA 30677, and has been one of the owners of EPM since its inception in 2008.  Allen has had no medical training or certifications.

18.     At all times relevant to the Complaint, EPC has been a Georgia professional corporation with its principal place of business at 1500 Langford Drive, Building 200, Watkinsville, GA 30677, that has operated a pain management clinic.  Although EPC has had satellite offices in Royston, Commerce and Monroe, Georgia, those offices are now closed. Approximately 50% of the patients seen at EPC are Medicare beneficiaries.  Employees of EPC conducted tests on Medicare beneficiaries and submitted claims to Medicare at the direction of Ellis and Allen.  EPC is solely owned by Ellis.  EPC"s officers are Ellis and Allen, with Ellis listed as the C.E.O. and C.F.O. and Allen listed as EPC's Secretary in its filings with the State of Georgia. The daily operations of EPC are managed and controlled by Ellis and Allen.

19.     At all times relevant to the Complaint, EPM has been a Georgia limited liability company with its principal place of business at the same location as EPC, that is, 1500 Langford Drive, Building 200, Watkinsville, GA 30677.  EPM is owned and operated by Ellis and Allen, with each holding a 50 percent ownership interest. EPM owns the property located at 1500 Langford Drive.

20.     EPM is a practice management entity into whose accounts EPC deposits all of its revenue after EPC pays its operating expenses. However, EPC does all of its own billing and payment of its operating expenses. Further, upon information and belief and at all times relevant to this Complaint, EPM does not have any employees itself and the only practice managed by EPM is EPC.

21.     At all times relevant to the Complaint, the activities of both EPC and EPM were at the direction of and within the control of Ellis and Allen, who control both entities. As a result, EPM had knowledge, recklessly disregarded, or was deliberately ignorant of the fraudulent conduct of EPC, Ellis, and Allen alleged herein. Moreover, the profits of this conduct were deposited into EPM's account.

22.     EPM's relationship with EPC and the role of Ellis and Allen in the operation of both entities are such that EPM and EPC are not independent of one another. Accordingly, EPM is the alter ego or a mere instrumentality of EPC, or vice versa, and any treatment of EPM and EPC as separate, legal entities is inequitable.

## LEGAL AND REGULATORY FRAMEWORK

### I.     The False Claims Act

23.     The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly presenting or causing to be presented false or fraudulent claims for payment to the

United States, for knowingly making or using, or causing to be made or used, false records or statements material to false or fraudulent claims paid by the United States and for knowingly and improperly avoiding an obligation.  31 U.S.C. §§ 3729(a)(1).

24.    For purposes of the FCA,

(1) the terms "knowing" and "knowingly"—

    (A) mean that a person, with respect to information—

        (i)  has actual knowledge of the information;

        (ii)  acts in deliberate ignorance of the truth or falsity of the information; or

        (iii) acts in reckless disregard of the truth or falsity of the information; and

    (B) require no proof of specific intent to defraud[.]

31  U.S.C. § 3729(b)(1).

25.    The standard of proof under the FCA is a preponderance of the evidence.  31 U.S.C. § 3731(d).

26.    The FCA provides that a person is liable to the United States for three times the amount of damages that the United States sustains because of the act of that person, plus a civil penalty. For violations that occurred before November 2, 2015, the FCA imposes a penalty for each violation of not less than $5,500 and not more than $11,000. For violations occurring after November 2, 2015, all civil statutory penalties, including the FCA, are subject to an annual adjustment for inflation pursuant to Section 701 of the Bipartisan Budget Act of 2015, Public Law 114-74 (No. 2, 2015) ("BBA"). At this time, by operation of the BBA, for all FCA penalties assessed after February 3, 2017, whose associated violations occurred after November 2, 2015, the penalty for each violation is not less than $10,957 and not more than $21,916.

## II.     **The Medicare Program**

27.     In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare Program, as part of Title XVIII of the Social Security Act (the "Act"), to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions.  *See* 42 U.S.C. §§ 426, 426a.

28.     The United States administers the Medicare Program through HHS.  HHS delegates direct responsibility for the administration of the Medicare Program to its component agency, CMS.

29.     Medicare provides coverage for items and services that are reasonable and necessary to diagnose or treat an illness or injury or to improve a malformed body member. Payment will be provided if medical necessity can be substantiated.  Section 1862(a)(1) of the Social Security Act, CMS Manual System, Pub. 100-02, Medicare Benefit Policy Manual, Ch. 16, § 20.

30.     The Medicare Program consists of four parts.  42 U.S.C. §§ 1395c-1395i.  Part B ("Supplementary Medical Insurance for the Aged and Disabled") generally covers, *inter alia*, physicians' services, services and supplies incident to physicians' services, and diagnostic tests. *See* 42 U.S.C. § 1395k.

31.     As alleged herein, Defendants submitted, or caused to be submitted, false claims under Medicare Part B.

32.     To assist in the administration of Part B, CMS contracts with Medicare Administrative Contractors ("MACs") (previously "private insurance carriers" or "carriers") to administer and pay Part B claims submitted by health care providers from the Medicare Trust Fund.  42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100.  Physicians submit claims for

payment to MACs on behalf of Medicare beneficiaries and, in turn, the MACs process and pay those claims.

33.   At all times relevant to this Complaint, Cahaba Government Benefit Administrators, LLC ("Cahaba") was the MAC that administered Medicare Part B claims submitted by Defendants.[1]

34.   Medicare only pays for Part B services that are actually rendered, and that are "reasonable and necessary for the diagnosis or treatment of illness or injury."  42 U.S.C. § 1395y(a)(1)(A).  Part B providers also must certify that services are medically necessary.  42 C.F.R. § 424.24(g)(1).  Medicare will not reimburse a provider for services that are not reasonable and necessary.

35.   A provider may only submit a claim for a diagnostic test to Medicare if it was ordered by the physician (or qualified non-physician practitioner) for the Medicare beneficiary to treat a specific problem and the test was used by the provider to treat that problem.  *See* 42 C.F.R. § 410.32.  Medicare will not reimburse a provider for tests that do not meet these requirements.

36.   Health care providers that wish to submit claims for Medicare reimbursement must enroll in the Medicare Program.  As part of the enrollment process, the provider must certify its compliance with Medicare laws, regulations, and program instructions and conditions.  *See* 42 C.F.R. § 424.510.  Enrolled providers also have a duty to be knowledgeable of and comply with the statutes, regulations, and program instructions and conditions regarding coverage for services for which they seek reimbursement.  *See* 42 C.F.R. § 424.516(a).

37.   A participating provider must properly document in the patient's medical record the service or procedure performed.  42 C.F.R. § 410.32(d).

---

1 Cahaba continued to serve as the MAC for Georgia until February 26, 2018, at which time, Palmetto Government Benefit Administrator, LLC ("Palmetto") became the MAC for Georgia.

38.     Once the provider is enrolled or credentialed, the provider may submit claims to Medicare for services rendered to the patients.

39.     To obtain reimbursement from Medicare for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS-1500 form ("CMS-1500") or submit claims electronically using the 837P format ("837P").   The CMS-1500 contains the following certifications:

> In submitting this claims for payment from federal funds, I certify that: 1) the information on this form is true, accurate, and complete; 2) I have familiarized myself with all applicable laws, regulations and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically indicated and necessary and personally furnished by me or were incident to my professional service by my employee under my direct supervision, except as otherwise permitted by Medicare or TRICARE … .
>
> NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws

40.     Providers who submit claims electronically under 837P must also execute an Electronic Data Interchange ("EDI") Enrollment Form with CMS.   By executing the EDI Enrollment Form, a provider agrees to "be responsible for all Medicare claims submitted to CMS by itself, its employees, or its agents," and to "submit claims that are accurate, complete and truthful."

41.     By executing an EDI Enrollment Form, a provider also acknowledges "that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be

9

misrepresented or falsified any record or other information relating to that claim as required by this Agreement may, upon conviction be subject to a fine and/or imprisonment under applicable Federal law." *See, e.g.*, *Cahaba Medicare Part B EDI Application* (09/2013 v2.51); *Interactive EDI Agreement for Palmetto; EDI Enrollment for Novitas Solutions*.

42.     Among the information the provider includes on a CMS 1500 form or the 837P are certain five-digit codes, including Current Procedural Terminology ("CPT") and Healthcare Common Procedure Coding System ("HCPCS") codes, that identify the diagnosis, services rendered and for which reimbursement is sought, and the unique billing identification number of the "rendering provider" and the "referring provider or other source."  45 C.F.R. § 162.1002(a)-(b); Medicare Claims Processing Manual, Chapter 23, § 20.7 *et seq.*  CMS assigns reimbursement amounts to CPT and HCPCS codes.

43.     Providing accurate CPT and HCPCS codes on claims submission forms is material to and a condition of payment for the Federal Health Care Programs.  *See, e.g.*, Medicare Learning Network Fact Sheet, Medicare Billing:  837P and Form CMS-1500.

44.     Because it is not feasible for Medicare personnel to review every patient's medical records for the millions of claims for payments they receive from providers, the program relies on providers to comply with Medicare requirements and trusts providers to submit truthful and accurate certifications and claims.

45.     Generally, once a provider submits the CMS-1500 or electronic 837P to Medicare, the claim is paid directly to the provider without any review of supporting documentation, including medical records.

## FACTUAL ALLEGATIONS

46.     At all times relevant to this Complaint, Ellis and EPC were enrolled as suppliers of healthcare services to Medicare beneficiaries.

47.     Under the terms of the enrollment applications that they submitted, Ellis and EPC agreed to comply with all of the conditions imposed upon them by applicable federal law and regulations, including the requirement that they submit claims for reimbursement only for services that were actually performed and that were medically necessary.

48.     Ellis and EPC thus knew, recklessly disregarded or were deliberately ignorant of the conditions for reimbursement of medical services under the Medicare Program.

49.     Nonetheless, Defendants implemented a scheme by which they submitted and caused the submission of claims to Medicare for urine drug testing and ancillary testing that was never rendered and/or was medically unnecessary.

### I.  Urine Drug Testing

50.     Although testing urine for drugs may be an appropriate means to analyze and monitor the treatment of patients who are prescribed opioids on a long-term basis, Defendants used this tool as a means to bilk the United States out of millions of dollars.

51.     Drug testing is used to determine the presence or absence of drugs or metabolites, also known as "analytes," in a patient's system.

52.     Urine is the most common medium used for drug testing, and was the medium for testing used by EPC at all times relevant to the Complaint.

53.     Drug testing is performed in a number of contexts.  Some workplaces have mandatory drug testing requirements, in some instances required by federal regulations.  In the clinical health care context, urine drug tests are used to verify whether patients are taking their

prescribed drugs as directed and\or and to confirm that the patient is not taking other drugs, including illicit ones, which could interfere with their treatment or pose risks of overdose.  For this reason, providers often perform drug tests on patients who are prescribed pain medications at appropriate intervals when medically necessary to manage the patient's care.  When urine drug testing has been conducted and is medically necessary, Medicare will provide reimbursement for such tests.

### ***Drug Screening Tests***:

54.     Common practice in the medical community is to first order a drug screening test of a urine specimen ("drug screening test") to detect the presence or absence of drugs or analytes in the sample.  A drug screening test can also be referred to as a qualitative test, because it does not need to detect the specific amount of the drug in the urine specimen.

55.     A drug screening test can be conducted using a "Point of Care" drug test cup ("POC test cup") that has a number of built-in drug tests strips, each of which tests for a specific drug or drug class.  In such cups, where a drug is present in the urine sample, the corresponding test strip will react and so indicate the presence of the drug in the patient's urine.

56.     A drug screening test also can be conducted using an immunoassay analyzer machine, known as a "desktop" or "benchtop" analyzer, which are more sophisticated and generally reimbursed at higher levels than POC test cups.

57.     A typical drug screening test panel (whether by POC test cup or immunoassay analyzer) may include testing for the presence of cocaine, opiates, amphetamines, benzodiazepines, barbiturates and methadone.

58.     At all times relevant to this Complaint, Medicare only accepted HCPCS procedure codes G0431 and G0434 for drug screening tests:  G0431 was used for high-complexity analyzer

tests and G4034 was used for POC test cup tests.  EPC, at the direction Ellis and Allen, billed Medicare for its drug screening tests almost entirely under G0431.  Under the G0431 code, a physician could only submit a single claim to Medicare for a drug screening test conducted on a beneficiary on a particular date of service, regardless of how many drug classes were being tested.

### *Confirmation Tests*:

59.     Depending on the initial results from the drug screening test, it may be medically appropriate to perform a confirmation test on the same urine specimen to check the accuracy of the drug screen test results.  The clinical utility of a confirmation test depends, in part, on whether the drug screening test result is expected or unexpected, the patient's drug abuse history and clinical presentation.

60.     For example, if a patient is prescribed a certain drug, such as Xanax, a positive POC test result for benzodiazepines (of which Xanax is one) would be expected.  If the test result is negative for benzodiazepines, however, and the patient insists that she is taking her Xanax as prescribed, it may be reasonable and necessary to conduct a quantitative laboratory test to "confirm" the accuracy of the unexpected negative screening test result.

61.     Similarly, if a patient's POC test yielded a positive result for a non-prescribed or illicit drug, then it may be reasonable and necessary to conduct a quantitative laboratory test to evaluate (i.e., "confirm") this unexpected positive result.

62.     Importantly, the confirmation test should use a different methodology than the drug screening test.  That is, it would not be appropriate to use an immunoassay analyzer to confirm a screening test that also used an immunoassay analyzer.

63.     At all times relevant to this Complaint, EPC billed Medicare for its confirmation tests under procedure codes 80102 and G6058.

*__Quantitative Tests__*:

64.     In some cases, it may be medically appropriate to perform a quantitative drug test to determine the specific concentration of a specific drug in a patient's system.

65.     Quantitative drug testing is performed by more precise methodologies than an immunoassay analyzer, such as column chromatography in combination with mass spectrometry. Such methods include gas chromatography with mass spectrometry ("GCMS") and liquid chromatography with mass spectrometry ("LCMS").   These testing methodologies can provide quantitative results, identifying the *concentration* of a drug or analyte in a urine sample.

66.     LCMS technology enables the lab to test urine specimens for numerous drugs and analytes during a single run of an aliquot of a urine sample through the LCMS machine.

67.     From 2012 through 2015, EPC generally billed Medicare for quantitative tests for each drug or drug class tested, using CPT and Medicare billing codes assigned for quantitative tests of each drug or class and, in some cases, multiple units of those codes.

68.     The testing equipment needed to conduct a quantitative test is much more sophisticated than what is needed to perform a drug screening test.   Thus, quantitative testing is more expensive to perform and reimbursed at a higher rate than drug screening tests.

69.     EPC did not acquire the equipment necessary to conduct mass spectrometry testing until July 2013, and did not begin using it until August 2013.

70.     At all times relevant to this Complaint, including a time period prior to the acquisition and use of the mass spectrometry equipment, EPC, at the direction of Ellis and Allen, billed Medicare for quantitative tests under procedures codes in the 80000 series and, later, under HCPCS codes in the G6000 series.

### *Guidelines on Urine Drug Testing*:

71.     Several organizations have published guidelines regarding urine drug testing in the clinical setting, including for chronic pain patients prescribed opioids.  According to the Substance Abuse and Mental Health Services Administration ("SAMSHA"), the development of urine drug testing guidelines in the clinical setting draws on the experience of workplace drug testing, including the Federal Drug-Free Workplace Program and its guidelines ("Federal Workplace Guidelines").  *See* 73 Fed. Reg. 71858 (Nov. 25, 2008).

72.     Under the Federal Workplace Guidelines, a "Negative Result" includes results reported by certified laboratories when a valid specimen "contains no drug or the concentration of the drug is less than the cutoff concentration for that drug or drug class."  *Id.* at 71878 (Sec. 1.5). Laboratories may report a valid specimen as "negative" when "each initial drug test is negative[.]" *Id.* at 71894.    Under the Federal Workplace Guidelines, a negative result on these initial immunoassay tests do not require confirmation testing by another method.  *See id.*

73.     None of these guidelines recommended the routine use of quantitative urine drug testing.

74.     At all times relevant to the Complaint, these guidelines were publicly available and could be accessed by Ellis and Allen.

### *LCDs*:

75.     National Government Services, one of the MACs that administered claims submitted to Medicare**,** issued a Local Coverage Determination ("LCD") for drug screening tests (L28145), effective July 18, 2008 through September 30, 2015, which allowed for testing "when the result of the drug screen is different than that suggested by the patient's medical history, clinical presentation or patient's own statement."

76.     On or around October 1, 2015, Cahaba issued Local Coverage Determination ("LCD") L34501, entitled "Pathology and Laboratory: Qualitative Drug Testing," which states that drug screening tests "may be followed by confirmation with a second method, only if there is a positive or negative finding inconsistent with the setting of a symptomatic patient."  In other words, the results must be received and analyzed prior to the provider ordering the quantitative testing.  Cahaba further indicated: "Routine 'per visit' drug testing in chronic pain patients is noncovered."  Thus, providers may not use a standing order that authorizes the same set of tests for each patient.

77.     As of June 15, 2015, Cahaba provided notice to providers that effective October 1, 2015, LCD L35920, entitled "Pathology and Laboratory: Quantitative Drug Testing," would go into effect.   This LCD expressly stated: "[P]hysician-directed definitive profile testing is reasonable and necessary when ordered for a particular patient based upon historical use and community trends.  However, the same physician-defined profile is not reasonable and necessary for every patient in a physician's practice.  Definitive UDT [urine drug testing] orders should be individualized based on clinical history and risk assessment, and must be documented in the medical record. Some labs offer comprehensive definitive drug testing panel ("CDDP") of 40 or more drugs.   It is not reasonable and necessary to bill individual billing codes for this comprehensive testing."

78.     Cahaba further indicated: "Routine standing orders for all patients in a physician's practice are not reasonable and necessary.  Physician-defined standing orders for pre-determined drug panels according to specific patient profiles for a limited sequential period may be reasonable and necessary and must be documented in the patient's medical record."

79.     Palmetto's LCD 35724, which was effective October 1, 2015, did not allow for any standing orders with respect to drug screening tests, and instead required providers to engage in a patient-specific risk analysis to determine how often drug screening tests should be performed on patients.  For low risk patients, random testing should occur "1-2 times every 12 months for prescription medications, non-prescribed medication that may pose a safety risk if taken with prescribed medications, and illicit substances, based on patient history, clinical presentation, and/or community usage."  For moderate risk patients, random testing should occur one to two times every six months.  For high risk patients, random testing should be performed one to three times every three months.  Palmetto also did not reimburse for specimen "validity testing including, but not limited to, pH, specific gravity, oxidants, creatinine."

80.     The prior relevant LCD for Palmetto, LCD 35105, which was effective December 15, 2014, contained similar language.

81.     Ellis and Allen had access to these LCDs at all times relevant to the Complaint.  In particular, Ellis and Allen would have received the LCDs issued by Cahaba directly from Cahaba, which was their MAC, in 2015.

**A.  EPC's Urine Drug Testing Equipment**

82.     Prior to 2011, EPC used POC testing cups to conduct drug screening tests on its patients.  EPC would then send the urine specimen to an outside reference laboratory for confirmation testing.  Under this arrangement, EPC would bill Medicare for the drug screening tests, and the outside laboratory would bill Medicare for any additional drug tests that it conducted on EPC's patients.

83.     In 2010 or 2011, EPC obtained a Synamed IR-500 benchtop immunoassay analyzer ("IR-500") from Select Laboratory Partners, Inc. ("Select Lab").   Shortly after EPC began using the IR-500, EPC stopped sending its urine specimens to an outside reference laboratory.

84.     Due to its high volume of patients, EPC obtained a second IR-500 to conduct urine drug testing on or around 2013.

85.     The IR-500 uses enzyme immunoassays ("reagents") to test for the presence of a particular drug classes in the urine specimen.

86.     The reagents that EPC used with its IR-500 between 2012 and 2015 were manufactured by Lin-Zhi International, Inc. ("Lin-Zhi") and were provided to EPC by Select Lab.

87.     None of the Lin-Zhi reagents that EPC used between January 2012 and November 2013 to conduct its urine testing, with the exception of the reagents for creatinine and alcohol/ethanol, were cleared by the FDA to provide quantitative results.   To the contrary, the labels enclosed with the Lin-Zhi reagents contained the following limitation:   "[T]he test is not intended for quantifying the analytes in patient samples."

88.     In July 2013, EPC purchased Liquid Chromatography/Mass Spectrometry ("LCMS") equipment from Select Lab.   EPC began using the LCMS in August 2013.

**B.   EPC's Use Of "Shortcuts"**

89.     In 2011 or 2012, Ellis and Allen directed Coastal Medical Billing, Inc. ("Coastal"), the third-party billing company for EPC, to create a series of "shortcuts" in the billing software that Coastal used to submit EPC's claims to Medicare and other payers.

90.     The "shortcuts" operated as follows:  Ellis and Allen would tell Coastal which drug tests it wanted to include in a shortcut.  Coastal would create the shortcut and provide the name of the shortcut to Ellis and Allen.  When an EPC employee entered the name of the shortcut into the

billing software, the software automatically populated EPC's electronic claim form with the codes for the pre-determined tests that had been selected by Ellis and Allen.

91.     One of the shortcuts that EPC used during the relevant time period was called "UDSM."

92.     Allen directed the EPC employee in charge of billing to enter the UDSM shortcut into the billing software every time "urine drug screen" was circled on a patient's superbill, if the patient was a Medicare or Medicaid beneficiary (a separate shortcut called "UDS" was used for non-Medicare and non-Medicaid patients).

93.     In late January 2012, if the EPC employee entered the UDSM shortcut into the billing software, the following tests would automatically populate the claim form, even though there was no indication on the superbill that the tests had been conducted:

| Procedure Code | Procedure Description |
|---|---|
| G0431 | Drug screening test |
| 80102 | Drug confirmation test |
| 82570 | Creatinine level to test for kidney function or muscle injury |
| 83986 | Body fluid pH level |
| 82055 | Alcohol (ethanol) level |
| 80154 | Benzodiazepines level |
| 82145 | Amphetamines or methamphetamine level |
| 82205 | Barbiturates level |
| 82520 | Cocaine (drug) level |
| 82542 | Chemical analysis using chromatography technique |
| 83840 | Methadone level |
| 83925 | Opiates (drug) measurement (3 units) |

94.     As a result, instead of only submitting a claim to Medicare for the drug screening test that was conducted, EPC would use the UDSM shortcut to automatically add additional tests that it never conducted to the claim that it submitted to Medicare.

95.     Medicare, relying on EPC's representation that it had conducted all of the tests included on its claim form, would reimbursed EPC for all of those tests.

96.     If Medicare had known that EPC included tests on its claims that it never conducted, it would not have reimbursed EPC for those tests.

97.     Ellis and Allen would occasionally direct Coastal to change the specific tests included in each particular shortcut; however, the shortcuts did not vary by patient or reflect the individual patients' respective needs.

**C.  EPC Billed For Confirmation Tests That It Never Conducted.**

98.     A confirmation test must be conducted separately from, and using a different methodology than, the drug screening test that it is meant to confirm.

99.     EPC's employees and physicians were made aware of this requirement as early as December 2010, when EPC received a letter from coding trainer Linda Van Horn stating as much.

100.    During all times relevant to this Complaint, Ellis and Allen were aware of this requirement.

101.    Despite this, from January 2012 through early May 2012, EPC, at the direction of Ellis and Allen, used the UDSM shortcut to automatically bill Medicare for both a drug screening test and a drug confirmation test, even though it only ran a single test on the beneficiary's urine specimen.

102.    Moreover, the IR-500 that EPC used during this time period did not have the capability to run a confirmation test.

103.    The Lin-Zhi reagents that EPC used to run the drug screening tests on its IR-500 enclosed a label that warned the user that a more specific alternative chemical method must be

used in order to obtain a confirmed analytical result.  The label recommended using a GC/MS or LC/MS to run the confirmation test, neither of which EPC had at that time.

104.    As a result, EPC used the UDSM shortcut, at the direction of Ellis and Allen, to bill Medicare for confirmation tests that it had never conducted.

### _Patient E.A._

105.    For example, Medicare beneficiary E.A. was given a drug screening test when she came to EPC on January 25, 2012; she was not given any other urine drug tests.

106.    The only urine drug test indicated on E.A.'s superbill for January 25, 2012 was a "ten panel urine drug screen."

107.    Upon information and belief, the EPC employee in charge of billing entered the UDSM shortcut into the billing software, in accordance with Allen's instructions, which caused a confirmation test and 12 additional urine drug tests, in addition to the drug screening test, to automatically populate the claim form for E.A.'s January 25, 2012 visit:

| Procedure Code | Procedure Description |
| --- | --- |
| G0431 | Drug screening test |
| 80102 | Drug confirmation test |
| 82570 | Creatinine level to test for kidney function or muscle injury |
| 83986 | Body fluid pH level |
| 82055 | Alcohol (ethanol) level |
| 80154 | Benzodiazepines level |
| 82145 | Amphetamines or methamphetamine level |
| 82205 | Barbiturates level |
| 82520 | Cocaine (drug) level |
| 82542 | Chemical analysis using chromatography technique |
| 83840 | Methadone level |
| 83925 | Opiates (drug) measurement (3 units) |

108.    EPC submitted the claim for the confirmation test (and other tests) to Medicare on or around January 26, 2012.

109.    Medicare reimbursed EPC in the amount of $75.04 for the confirmation test that EPC had included on the claim form for E.A.'s January 25, 2012 visit on or around January 30, 2012.

110.    If Medicare had known that EPC had not actually conducted the confirmation test for E.A. on January 25, 2012, it would not have reimbursed EPC for the test.

### *Patient G.A.*

111.    Medicare beneficiary G.A. was given a drug screening test when she came to EPC on March 7, 2012; she was not given any other urine drug tests.

112.    The only urine drug test indicated on G.A.'s superbill for March 7, 2012 was a "ten panel urine drug screen."

113.    Upon information and belief, the EPC employee in charge of billing entered the UDSM shortcut into the billing software, in accordance with Allen's instructions, which caused a confirmation test and 12 additional urine drug tests, in addition to the drug screening test, to automatically populate the claim form for G.A.'s March 7, 2012 visit:

| Procedure Code | Procedure Description |
|---|---|
| G0431 | Drug screening test |
| 80102 | Drug confirmation test |
| 82570 | Creatinine level to test for kidney function or muscle injury |
| 83986 | Body fluid pH level |
| 82055 | Alcohol (ethanol) level |
| 80154 | Benzodiazepines level |
| 82145 | Amphetamines or methamphetamine level |
| 82205 | Barbiturates level |
| 82520 | Cocaine (drug) level |
| 82542 | Chemical analysis using chromatography technique |
| 83840 | Methadone level |
| 83925 | Opiates (drug) measurement (3 units) |

22

114.    EPC submitted the claim for the confirmation test (and other tests) to Medicare on March 12, 2012.

115.    Medicare reimbursed EPC in the amount of $75.04 for the confirmation test that EPC had included on the claim form for G.A.'s March 7, 2012 visit on or around March 15, 2012.

116.    If Medicare had known that EPC had not actually conducted the confirmation test for G.A. on March 7, 2012, it would not have reimbursed EPC for the test.

### *Patient M.A.*

117.    Medicare beneficiary M.A. was given a drug screening test when she came to EPC on April 12, 2012; she was not given any other urine drug tests.

118.    The only urine drug test indicated on M.A.'s superbill for April 12, 2012 was a "ten panel urine drug screen."

119.    Upon information and belief, the EPC employee in charge of billing entered the UDSM shortcut into the billing software, in accordance with Allen's instructions, which caused a confirmation test and 12 additional urine drug tests, in addition to the drug screening test, to automatically populate the claim form for M.A.'s April 12, 2012 visit:

| Procedure Code | Procedure Description |
| --- | --- |
| G0431 | Drug screening test |
| 80102 | Drug confirmation test |
| 82570 | Creatinine level to test for kidney function or muscle injury |
| 83986 | Body fluid pH level |
| 82055 | Alcohol (ethanol) level |
| 80154 | Benzodiazepines level |
| 82145 | Amphetamines or methamphetamine level |
| 82205 | Barbiturates level |
| 82520 | Cocaine (drug) level |
| 82542 | Chemical analysis using chromatography technique |
| 83840 | Methadone level |
| 83925 | Opiates (drug) measurement (3 units) |

120.    EPC submitted the claim for the confirmation test (and other tests) to Medicare on or around April 16, 2012.

121.    Medicare reimbursed EPC in the amount of $75.04 for the confirmation test that EPC had included on the claim form for M.A.'s April 12, 2012 visit on or around April 19, 2012.

122.    If Medicare had known that EPC had not actually conducted the confirmation test for G.A. on April 12, 2012, it would not have reimbursed EPC for the test.

### *Patient D.A.*

123.    Medicare beneficiary D.A. was given a drug screening test when he came to EPC on May 1, 2012; he was not given any other urine drug tests.

124.    The only urine drug test indicated on D.A.'s superbill for May 1, 2012 was a "ten panel urine drug screen."

125.    Upon information and belief, the EPC employee in charge of billing entered the UDSM shortcut into the billing software, in accordance with Allen's instructions, which caused a confirmation test and 12 additional urine drug tests, in addition to the drug screening test, to automatically populate the claim form for D.A.'s May 1, 2012 visit:

| Procedure Code | Procedure Description |
| --- | --- |
| G0431 | Drug screening test |
| 80102 | Drug confirmation test |
| 82570 | Creatinine level to test for kidney function or muscle injury |
| 83986 | Body fluid pH level |
| 82055 | Alcohol (ethanol) level |
| 80154 | Benzodiazepines level |
| 82145 | Amphetamines or methamphetamine level |
| 82205 | Barbiturates level |
| 82520 | Cocaine (drug) level |
| 82542 | Chemical analysis using chromatography technique |
| 83840 | Methadone level |
| 83925 | Opiates (drug) measurement (3 units) |

126.    EPC submitted the claim for the confirmation test (and other tests) to Medicare on or around May 2, 2012.

127.    Medicare reimbursed EPC in the amount of $75.04 for the confirmation test that EPC had included on the claim form for D.A.'s May 1, 2012 visit on or around May 5, 2012.

128.    If Medicare had known that EPC had not actually conducted the confirmation test for G.A. on May 1, 2012, it would not have reimbursed EPC for the test.

129.    EPC stopped billing Medicare for confirmation tests in May 2012, but re-started billing for confirmation tests in May 2015 as part of a new shortcut when Ellis and Allen directed Coastal to create call "LCMSM."

130.    When an EPC employee entered the LCMSM shortcut in the billing software, it automatically populated the claim form with the codes for a confirmation test and a series of quantitative tests that had been pre-selected by Ellis and Allen.

### ***Patient L.H.***

131.    For example, Medicare beneficiary L.H. was given a drug screening test when she came to EPC on July 27, 2015.

132.    The drug screening teste indicated the presence of methadone in L.H.'s urine specimen.

133.    EPC ran L.H.'s urine specimen on the LCMS.

134.    Upon information and belief, the EPC employee in charge of billing entered the LCMSM shortcut into the billing software, in accordance with Allen's instructions, which caused 5 confirmation tests and 9 quantitative tests to automatically populate the claims form for L.H.'s July 27, 2015 visit:

| Procedure Code | Procedure Description |
|---|---|
| G6058 | Drug confirmation, each procedure (5 units) |
| G6031 | Benzodiazepines level |
| G6042 | Amphetamines or methamphetamine level |
| G6044 | Cocaine or metabolite level |
| G6053 | Methadone level |
| 83992 | PCP drug level |
| G6056 | Opiates (drug) and metabolites measurement (4 units) |

135.    On or around August 13, 2015, EPC submitted a claim to Medicare for the confirmation and quantitative tests.

136.    Medicare reimbursed EPC in the amount of $21.78 (methadone) and $17.67 for each confirmation test on or around August 17, 2015.

137.    If Medicare had known that EPC had billed the single methadone quantitative test that EPC ran on the LCMS as both a confirmation test and a methadone quantitative test, it would not have reimbursed EPC for both of those tests.

### D.  EPC's Billed For Quantitative Tests That It Never Conducted.

134.    EPC did not have the equipment needed to run quantitative urine drug tests (other than for creatinine and alcohol/ethanol) between January 2012 and early July 2013.

135.    The only equipment that EPC used for urine drug testing from January 2012 through July 2013 was the IR-500.

136.    The Lin-Zhi reagents that EPC used with the IR-500 to conduct the urine drug tests (other than creatinine and alcohol/ethanol) were not cleared by the FDA to conduct quantitative testing.

137.   The label enclosed with the Lin-Zhi reagents (other than creatinine and alcohol/ethanol) expressly stated that the reagents were not intended for quantifying the analytes in the patient sample.

138.   The IR-500 that EPC used during this time period was neither calibrated nor customized to run quantitative urine drug tests.

139.   Despite this, EPC used the UDSM shortcut, at the direction of Ellis and Allen, to bill a single run on the IR-500 as a drug screening test and several different quantitative tests to Medicare, during the January 2012 through July 2013 time period.

140.   As a result, EPC used the UDSM shortcut, at the direction of Ellis and Allen, to bill Medicare for quantitative tests that it never conducted.

### *Patient E.A.*

141.   For example, Medicare beneficiary E.A. was given a drug screening test when she came to EPC on January 25, 2012; she was not given any other urine drug tests.

142.   The only urine drug test indicated on E.A.'s superbill for January 25, 2012 was a "ten panel urine drug screen."

143.   Upon information and belief, the EPC employee in charge of billing entered the UDSM shortcut into the billing software, in accordance with Allen's instructions, which caused a confirmation test and 12 quantitative urine drug tests to automatically populate the claim form for E.A.'s January 25, 2012 visit.

144.   EPC submitted the claim for E.A.'s January 25, 2012 visit on or around January 26, 2012.

145.   At the time EPC submitted the claim for E.A.'s January 25, 2012 visit, EPC did not have the equipment to run the following 9 quantitative urine drug tests included on the claim:

| Procedure Code | Procedure Description |
|---|---|
| 80154 | Benzodiazepines level |
| 82145 | Amphetamines or methamphetamine level |
| 82205 | Barbiturates level |
| 82520 | Cocaine (drug) level |
| 82542 | Chemical analysis using chromatography technique |
| 83840 | Methadone level |
| 83925 | Opiates (drug) measurement (3 units) |

146.     Medicare reimbursed EPC in the amount of $192.33 for the 9 quantitative urine drug tests that EPC had included on the claim form for E.A.'s January 25, 2012 visit.

147.     If Medicare had known that EPC had not actually conducted 9 quantitative urine drug tests for E.A. on January 25, 2012, it would not have reimbursed EPC for the tests.

148.     The following are additional examples of claims that EPC submitted to Medicare for the same 9 quantitative urine drug tests, even though it never conducted those tests:

| Medicare beneficiary | Date of test | Date claim submitted to Medicare | Date claim paid by Medicare | Amount paid by Medicare |
|---|---|---|---|---|
| G.A. | 3/7/2012 | 3/12/2012 | 3/15/2012 | $192.33 |
| M.A. | 4/12/2012 | 4/16/2012 | 4/19/2012 | $192.33 |
| D.A. | 5/1/2012 | 5/2/2012 | 5/5/2012 | $192.33 |
| P.A. | 5/22/2012 | 5/24/2012 | 6/1/2012 | $192.33 |
| S.S. | 7/17/2012 | 7/18/2012 | 7/21/2012 | $192.33 |
| E.A. | 10/24/2012 | 10/25/2012 | 10/29/2012 | $192.33 |
| B.S. | 11/8/2012 | 11/13/2012 | 11/16/2012 | $192.33 |
| J.S. | 12/14/2012 | 12/17/2012 | 12/20/2012 | $192.33 |
| G.S. | 12/17/2012 | 12/19/2012 | 12/22/2012 | $192.33 |
| M.A. | 12/28/2012 | 1/3/2013 | 1/7/2013 | $192.33 |
| P.A. | 1/2/2013 | 1/7/2013 | 1/14/2013 | $186.63 |
| D.L. | 3/25/2013 | 3/26/2013 | 3/29/2013 | $186.63 |
| L.J. | 6/27/2013 | 8/5/2013 | 8/8/2013 | $182.90 |

149.     Even though EPC began using the LCMS, which had the capability of conducting quantitative tests, in August 2013, EPC continued to bill Medicare for quantitative tests even when it did not use the LCMS.

150.     Between August 2013 and early November 2013, EPC used the UDSM shortcut, at the direction of Ellis and Allen, to automatically bill Medicare for quantitative tests every time a urine drug screening test was conducted on the IR-500.  As a result, EPC used the UDSM shortcut, at the direction of Ellis and Allen, to bill Medicare for quantitative tests that it never conducted.

### *Patient K.J.*

151.     For example, Medicare beneficiary K.J. was given a drug screening test that was run on the IR-500 when she came to EPC on August 14, 2013; she was not given any other urine drug tests.

152.     The only urine drug test indicated on K.J.'s superbill for August 14, 2013 was a "Ten Panel Urine Drug Screen 60 Per panel."

153.     Upon information and belief, the EPC employee in charge of billing entered the UDSM shortcut into the billing software, in accordance with Allen's instructions, which caused the following 10 quantitative tests to automatically populate the claim form for K.J.'s August 14, 2013 visit, even though the IR-500 was not capable of running these tests.

| Procedure Code | Procedure Description |
|---|---|
| 80154 | Benzodiazepines level |
| 82145 | Amphetamines or methamphetamine level |
| 82205 | Barbiturates level |
| 82520 | Cocaine (drug) level |
| 82542 | Chemical analysis using chromatography technique |
| 83840 | Methadone level |
| 84311 | Chemical analysis using spectrophotometry (light) |
| 83925 | Opiates (drug) measurement (3 units) |

154.   EPC submitted the claim for these tests to Medicare on our around September 23, 2013.

155.   Medicare reimbursed EPC in the amount of $132.08 for the 10 quantitative urine drug tests that EPC had included on the claim form for K.J.'s August 14, 2013 visit.

156.   If Medicare had known that EPC had not actually conducted the 10 quantitative urine drug tests for K.J. on August 14, 2013, it would not have reimbursed EPC for the tests.

### E.   EPC Billed for Urine Drug Tests That Were Never Ordered.

157.   Medicare only reimburses for tests that are reasonable and necessary for the diagnosis and treatment of illness or injury.  *See* 42 U.S.C. § 1395y(a)(1)(A).  *See also* 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 411.15(k)(1).

158.   In order to be deemed reasonable and necessary, a test must be ordered by the Medicare beneficiary's treating physician (or qualified non-physician practitioner) for a specific medical problem.  *See* 42 C.F.R. § 410.32(a).

159.   Between 2012 and 2015, EPC, at the direction of Ellis and Allen, billed Medicare for confirmation drug tests and quantitative drugs tests that were never ordered by the treating physician (or qualified non-physician practitioner) and, therefore, were not reimbursable by Medicare.

160.   The following are examples of the claims that EPC submitted to Medicare in which it billed for confirmation tests that were never ordered by the beneficiary's treating physician (or qualified non-physician practitioner):

| Medicare beneficiary | Date of test | Date claim submitted to Medicare | Date claim paid by Medicare | Amount paid by Medicare for Confirmation Test |
|---|---|---|---|---|
| E.A. | 1/25/2012 | 1/26/2012 | 1/30/2012 | $75.04 |
| G.A. | 3/7/2012 | 3/12/2012 | 3/15/2012 | $75.04 |
| M.A. | 4/12/2012 | 4/16/2012 | 4/19/2012 | $75.04 |
| D.A. | 5/1/2012 | 5/2/2012 | 5/5/2012 | $75.04 |

161.   If Medicare had known that there were no orders from the beneficiary's treating physician (or qualified non-physician practitioner) for these confirmation tests, it would not have reimbursed EPC for the tests.

162.   The following are examples of claims that EPC submitted to Medicare in which it billed for quantitative tests that were never ordered by the beneficiary's treating physician (or qualified non-physician practitioner):

| Medicare beneficiary | Date of test | Date claim submitted to Medicare | Date claim paid by Medicare | Amount paid by Medicare for Quantitative Tests |
|---|---|---|---|---|
| E.A. | 1/25/2012 | 1/26/2012 | 1/30/2012 | $220.03 |
| G.A. | 3/7/2012 | 3/12/2012 | 3/15/2012 | $220.03 |
| M.A. | 4/12/2012 | 4/16/2012 | 4/19/2012 | $220.03 |
| D.A. | 5/1/2012 | 5/2/2012 | 5/5/2012 | $220.03 |
| P.A. | 5/22/2012 | 5/24/2012 | 6/1/2012 | $220.03 |
| S.S. | 7/17/2012 | 7/18/2012 | 7/21/2012 | $220.03 |
| E.A. | 10/24/2012 | 10/25/2012 | 10/29/2012 | $220.03 |
| B.S. | 11/8/2012 | 11/13/2012 | 11/16/2012 | $220.03 |
| J.S. | 12/14/2012 | 12/17/2012 | 12/20/2012 | $220.03 |
| G.S. | 12/17/2012 | 12/19/2012 | 12/22/2012 | $220.03 |
| M.A. | 12/28/2012 | 1/3/2013 | 1/7/2013 | $229.23 |
| P.A. | 1/2/2013 | 1/7/2013 | 1/14/2013 | $223.12 |
| D.L. | 3/25/2013 | 3/26/2013 | 3/29/2013 | $223.12 |
| L.J. | 6/27/2013 | 8/5/2013 | 8/8/2013 | $218.66 |
| K.J. | 8/14/2013 | 9/23/2013 | 9/26/2013 | $156.09 |

163.     If Medicare had known that there were no orders from the beneficiary's treating physician (or qualified non-physician practitioner) for these quantitative tests, it would not have reimbursed EPC for the tests.

**F.  EPC Billed for Urine Drug Tests That Had No Clinical Utility.**

164.     Between January 2012 and November 2013, EPC, at the direction of Ellis and Allen, used the UDSM shortcut to bill Medicare automatically for confirmation tests and/or quantitative drug tests every time it billed for a drug screening test, regardless of whether there was any indication of medical necessity for the test in the patient's records.

***Patient D.K.***

165.     Medicare beneficiary D.K. was given a drug screening test when she came to EPC on May 17, 2012.

166.     The drug screening test indicated the presence of opiates and benzodiazepines in D.K.'s urine specimen.

167.     At that time, D.K. had been prescribed Percocet and MS Contin, which are opioids.

168.     Upon information and belief, the EPC employee in charge of billing entered the UDSM shortcut into the billing software, in accordance with Allen's instructions, which caused the following 9 tests, which were not medically necessary, to automatically populate the claims form for D.K.'s May 17, 2012 visit:

| Procedure Code | Procedure Description |
|---|---|
| 80154 | Benzodiazepines level |
| 82145 | Amphetamines or methamphetamine level |
| 82205 | Barbiturates level |
| 82520 | Cocaine (drug) level |
| 82542 | Chemical analysis using chromatography technique |
| 83840 | Methadone level |
| 83925 | Opiates (drug) measurement (3 units) |

32

169.     On or around May 21, 2012, EPC submitted a claim to Medicare for the quantitative tests.

170.     Medicare reimbursed EPC in the amount of $192.33 for the 9 quantitative tests on or around May 24, 2012.

171.     If Medicare had known that the quantitative tests were not medically necessary, it would not have reimbursed EPC for those tests.

### *Patient L.F.*

172.     Medicare beneficiary L.F. was given a drug screening test when she came to EPC on July 3, 2012.

173.     The drug screening test indicated the presence of benzodiazepines and oxycodone in L.F.'s urine specimen.

174.     At that time, L.F. had been prescribed Xanax, a benzodiazepine, and oxycodone.

175.     The office note indicated that L.F. showed no aberrant drug related behavior.

176.     Upon information and belief, the EPC employee in charge of billing entered the UDSM shortcut into the billing software, in accordance with Allen's instructions, which caused 9 quantitative tests, which were not medically necessary, to automatically populate the claims form for L.F.'s July 3, 2012 visit:

| Procedure Code | Procedure Description |
|---|---|
| 80154 | Benzodiazepines level |
| 82145 | Amphetamines or methamphetamine level |
| 82205 | Barbiturates level |
| 82520 | Cocaine (drug) level |
| 82542 | Chemical analysis using chromatography technique |
| 83840 | Methadone level |
| 83925 | Opiates (drug) measurement (3 units) |

177.    On our around July 9, 2012, EPC submitted a claim to Medicare for the 9 quantitative tests.

178.    Medicare reimbursed EPC in the amount of $192.33 for the quantitative tests on or around July 13, 2012.

179.    If Medicare had known that the quantitative tests were not medically necessary, it would not have reimbursed EPC for the tests.

### *Patient R.T.*

180.    Medicare beneficiary R.T. was given a drug screening test when she came to EPC on September 7, 2012.

181.    The drug screening test indicated the presence of benzodiazepines and oxycodone in R.T.'s urine specimen.

182.    At that time, R.T. had been prescribed Zanaflex, Duragesic and Percocet, which contains oxycodone.

183.    The office visit noted indicated that R.T. showed no aberrant drug related behavior.

184.    Upon information and belief, the EPC employee in charge of billing entered the UDSM shortcut into the billing software, in accordance with Allen's instructions, which caused 9 different quantitative tests, which were not medically necessary, to automatically populate the claim form for R.T.'s September 7, 2012 visit:

| Procedure Code | Procedure Description |
|---|---|
| 80154 | Benzodiazepines level |
| 82145 | Amphetamines or methamphetamine level |
| 82205 | Barbiturates level |
| 82520 | Cocaine (drug) level |
| 82542 | Chemical analysis using chromatography technique |
| 83840 | Methadone level |
| 83925 | Opiates (drug) measurement (3 units) |

185.    On or around September 11, 2012, EPC submitted a claim to Medicare for the 9 quantitative tests.

186.    Medicare reimbursed EPC in the amount of $192.33 for the quantitative tests on or around September 14, 2012.

187.    If Medicare had known that the quantitative tests were not medically necessary, it would not have reimbursed EPC for the tests.

### *Patient R.B.*

188.    Medicare beneficiary R.B. was given a drug screening test when she came to EPC on November 7, 2012.

189.    The drug screening test indicated the presence of opiates in R.B.'s urine specimen.

190.    At that time, R.B. had been prescribed Dilaudid, an opioid, and Lortab, which contains hydrocodone, an opiate.

191.    The office visit note indicated that R.B. showed no aberrant drug related behavior.

192.    Upon information and belief, the EPC employee in charge of billing entered the UDSM shortcut into the billing software, in accordance with Allen's instructions, which caused 9 different quantitative tests, which were not medically necessary, to automatically populate the claims form for R.B.'s November 7, 2012 visit:

| Procedure Code | Procedure Description |
|---|---|
| 80154 | Benzodiazepines level |
| 82145 | Amphetamines or methamphetamine level |
| 82205 | Barbiturates level |
| 82520 | Cocaine (drug) level |
| 82542 | Chemical analysis using chromatography technique |
| 83840 | Methadone level |
| 83925 | Opiates (drug) measurement (3 units) |

193.   On or around November 8, 2012, EPC submitted a claim to Medicare for the 9 quantitative tests.

194.   Medicare reimbursed EPC in the amount of $192.33 for the 9 quantitative tests on or around November 12, 2012.

195.   If Medicare had known that the quantitative tests were not medically necessary, it would not have reimbursed EPC for the tests.

### *Patient E.S.*

196.   Medicare beneficiary E.S. was given a drug screening test when he came to EPC on January 7, 2013.

197.   The drug screening tested indicated the presence of opiates.

198.   At that time, E.S. had been prescribed Lortab, which contains hydrocodone, an opiate.

199.   The office visit note indicated that E.S. showed no aberrant drug related behavior.

200.   Upon information and belief, the EPC employee in charge of billing entered the UDSM shortcut into the billing software, in accordance with Allen's instructions, which caused the following 10 quantitative tests, which were not medically necessary, to automatically populate the claims form for E.S.'s January 7, 2013 visit:

36

| Procedure Code | Procedure Description |
|---|---|
| 80154 | Benzodiazepines level |
| 82145 | Amphetamines or methamphetamine level |
| 82205 | Barbiturates level |
| 82520 | Cocaine (drug) level |
| 82542 | Chemical analysis using chromatography technique |
| 83840 | Methadone level |
| 84311 | Chemical analysis using spectrophotometry (light) |
| 83925 | Opiates (drug) measurement (3 units) |

201.    On or around January 10, 2013, EPC submitted a claim to Medicare for the 10 additional tests.

202.    Medicare reimbursed EPC in the amount of $196.24 for the 10 additional tests on or around January 14, 2013.

203.    If Medicare had known that the 10 additional tests were not medically necessary, it would not have reimbursed EPC for those tests.

### *Patient J.T.*

204.    Medicare beneficiary J.T. was given a drug screening test when she came to EPC on March 6, 2013.

205.    The drug screening test indicated the presence of opiates in J.T.'s urine specimen.

206.    At that time J.T. had been prescribed Lortab, which contains hydrocodone, an opiate and Tramadol, an opioid.

207.    The office visit note indicated that J.T. showed no aberrant drug related behavior.

208.    Upon information and belief, the EPC employee in charge of billing entered the UDSM shortcut into the billing software, in accordance with Allen's instructions, which caused the following 10 quantitative tests and an additional spectrophotometry test, which were not medically necessary, to automatically populate the claims form for J.T.'s March 6, 2013 visit.

| Procedure Code | Procedure Description |
|---|---|
| 80154 | Benzodiazepines level |
| 82145 | Amphetamines or methamphetamine level |
| 82205 | Barbiturates level |
| 82520 | Cocaine (drug) level |
| 82542 | Chemical analysis using chromatography technique |
| 83840 | Methadone level |
| 84311 | Chemical analysis using spectrophotometry (light) |
| 83925 | Opiates (drug) measurement (3 units) |

209.    On or around March 18, 2013, EPC submitted a claim to Medicare for the 10 additional tests.

210.    Medicare reimbursed EPC in the amount of $196.24 for the 10 additional tests on or around March 21, 2013.

211.    If Medicare had known that the quantitative tests were not medically necessary, it would not have reimbursed EPC for those tests.

### *LCMSM Shortcut*

212.    In 2013, Ellis and Allen directed Coastal to create a new shortcut called "LCMSM."

213.    When an EPC employee entered the LCMSM shortcut into the billing software, it would automatically populate the claim form with a series of codes for quantitative tests.

214.    Although Ellis and Allen directed Coastal to make changes to the tests that were included in the LCMSM over time, the tests in the LCMSM shortcut did not vary based on individual patient need.

215.    As a result, EPC used the LCMSM shortcut between August 2013 and December 2015, at the direction of Ellis and Allen, to bill Medicare for a series of quantitative tests regardless of whether they were medically necessary.

*Patient L.C.*

216.    Medicare beneficiary L.C. was given a drug screening test when she came to EPC on July 9, 2014.

217.    The drug screening test indicated the presence of oxycodone, amphetamines and benzodiazepines in L.C.'s urine specimen.

218.    At that time, L.C. had been prescribed Roxicodone, a brand name for oxycodone, Vyvanse, a stimulant and Valium, a benzodiazepine.

219.    The office visit note indicated that L.C. showed no aberrant drug related behavior.

220.    Upon information and belief, the EPC employee in charge of billing entered the LCMSM shortcut into the billing software, in accordance with Allen's instructions, which caused the 14 quantitative tests to automatically populate the claims form for L.C.'s July 9, 2014 visit:

| Procedure Code | Procedure Description |
| --- | --- |
| 80154 | Benzodiazepines level (2) |
| 82145 | Amphetamines or methamphetamine level |
| 82520 | Cocaine (drug) level |
| 83840 | Methadone level (2) |
| 82646 | Dihydrocodeinone (drug) measurement |
| 82649 | Dihydromorphinone (drug) level |
| 83805 | Meprobamate (sedative) level |
| 83992 | PCP drug level |
| 83925 | Opiates (drug) measurement (4 units) |

221.    On or around July 16, 2014, EPC submitted a claim to Medicare for 14 quantitative tests, including tests to determine the quantity of amphetamines, cocaine, methadone and PCP in L.C.'s urine specimen, even though such drugs were never prescribed to L.C. and the initial screening test showed no indications of such drugs being present.

222.     Medicare reimbursed EPC in the amount of $335.95 for the quantitative tests on or around July 19, 2014.

223.     If Medicare had known that the confirmation and quantitative tests were not medically necessary, it would not have reimbursed EPC for those tests.

### *Patient M.M.*

224.     Medicare beneficiary M.M. was given a drug screening test when she came to EPC on January 16, 2015.

225.     The drug screening test indicated the presence of opiates and benzodiazepines in M.M.'s urine specimen.

226.     At that time, M.M. had been prescribed Fentanyl, an opioid, and Valium, a benzodiazepine.

227.     The office visit note indicated that M.M. showed no aberrant drug related behavior.

228.     EPC physician's assistant Kerri McKinney ordered a confirmation test "to verify inconsistent UDS Assay results given patient history today and current prescribed medication."

229.     Upon information and belief, the EPC employee in charge of billing entered the LCMSM shortcut into the billing software, in accordance with Allen's instructions, which caused the 14 additional tests to automatically populate the claims form for M.M.'s January 16, 2015 visit:

| Procedure Code | Procedure Description |
|---|---|
| G6058 | Drug confirmation (5 units) |
| G6031 | Benzodiazepines level |
| G6042 | Amphetamines or methamphetamine level |
| G6044 | Cocaine (drug) level |
| G6053 | Methadone level |
| 83992 | PCP drug level |
| G6056 | Opiates (drug) measurement (4 units) |

230.    A year and a half later, on July 12, 2016, EPC physician's assistant McKinney added a note to the January 16, 2015 note that said the urine drug screen on the LCMS was "ordered to verify presence of fentanyl."

231.    On or around July 28, 2016, EPC submitted a claim to Medicare for 5 confirmation tests and 9 quantitative tests, including tests to determine the quantity of amphetamines, cocaine, methadone and phencyclidine in M.M.'s urine specimen.

232.    Medicare reimbursed EPC in the amount of $291.72 for the confirmation and quantitative tests on or around August 13, 2016.

233.    If Medicare had known that the confirmation and quantitative tests were not medically necessary, it would not have reimbursed EPC for those tests.

### Patient L.H.

234.    Medicare beneficiary L.H. was given a drug screening test when she came to EPC on July 27, 2015.

235.    The drug screening test indicated the presence of oxycodone, benzodiazepines and methamphetamine in L.H.'s urine specimen.

236.    At that time, L.H. had been prescribed oxycodone and clonazepen, a benzodiazepine.

237.    Upon information and belief, the EPC employee in charge of billing entered the LCMSM shortcut into the billing software, in accordance with Allen's instructions, which caused the 14 additional tests, only one of which was a methamphetamine quantitative test, to automatically populate the claims form for L.H.'s July 27, 2015 visit:

| Procedure Code | Procedure Description |
| --- | --- |
| G6058 | Drug confirmation (5 units) |
| G6031 | Benzodiazepines level |
| G6042 | Amphetamines or methamphetamine level |
| G6044 | Cocaine (drug) level |
| G6053 | Methadone level |
| 83992 | PCP drug level |
| G6056 | Opiates (drug) measurement (4 units) |

238.    On or around August 13, 2015, EPC submitted a claim to Medicare for the 5 confirmation and 9 quantitative tests.

239.    Medicare reimbursed EPC in the amount of $20.73 for the methadone quantitative test and $270.99 for the 13 additional tests on or August 17, 2015.

240.    If Medicare had known that the 13 additional tests were not medically necessary, it would not have reimbursed EPC for those tests.

**II.    Ancillary Tests**

241.    EPC further maximized its revenue per patient by billing Medicare for a series of ancillary tests on a pre-set schedule regardless of the individual signs, symptoms, complaints and medical history of each patient.

242.    Ellis and Allen created the pre-set schedule for performing the ancillary tests.

243.    Ellis and Allen instructed EPC's clinical providers to conduct each ancillary test according to the pre-set schedule, without regard to the patient's individual signs, symptoms, complaints or medical history.

244.    Ellis and Allen requested that EPC's electronic medical records system alert the provider when each test became "due" for a particular patient under the pre-set schedule.

245.    Medicare only pays for tests that are ordered by the treating physician (or qualified non-physician practitioner) for a specific medical problem.  *See* 42 C.F.R. § 410.32(a).

246.    EPC's practice of billing for ancillary tests that were performed on a pre-set schedule regardless of their patients' individual signs, symptoms, complaints and personal medical history was inconsistent with the Medicare requirement that tests be ordered to address a specific medical problem.

247.    The claims that EPC submitted to Medicare for ancillary tests that were conducted in the absence of signs, symptoms, complaints or relevant medical history warranting the medical necessity of the tests were not reimbursable under the Medicare Program.

248.    Ellis and Allen were aware that they were causing EPC to submit claims to Medicare for ancillary tests that were not reimbursable by Medicare.

### *Arterial Brachial Index (ABI) tests*

249.    EPC used procedure code 93922 and 93923 to bill Medicare for the Arterial Brachial Index (ABI) tests that it performed on its patients.

250.    EPC ordered the ABI test as a screening test rather than to address a specific medical problem.

251.    The following are some examples of claims submitted by EPC to Medicare for ABI tests that were not medically necessary:

a.    ***Patient D.J.*:**    On or around April 16, 2012, EPC conducted an ABI test on Medicare beneficiary D.J.

i.    D.J.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for the ABI test.

    ii.  D.J. previously had an ABI test on October 4, 2011, and the results were normal.

    iii.  EPC submitted a claim to Medicare for D.J.'s April 16, 2012 ABI test on or around April 17, 2012.

    iv.  On or around April 20, 2012, Medicare reimbursed EPC for the April 16, 2012 ABI test in the amount of $117.20.

    v.  If Medicare had known that the ABI test was not reasonable and necessary, it would not have reimbursed EPC for the test.

b. **_Patient C.A._:**   On or around September 13, 2012, EPC conducted an ABI test on Medicare beneficiary C.A.

    i.  C.A.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for the ABI test.

    ii.  The medical records described the ABI test as "routine" and as a test that was conducted in order to "screen" for Peripheral Arterial Disease.

    iii.  C.A. previously had an ABI test on March 1, 2012, and the results were normal.

    iv.  EPC submitted a claim to Medicare for C.A.'s September 13, 2012 ABI test on or around September 17, 2012.

    v.  On or around September 20, 2012, Medicare reimbursed EPC for the September 13, 2012 ABI test in the amount of $75.54.

    vi.  If Medicare had known that the ABI test was not reasonable and necessary, it would not have reimbursed EPC for the test.

    c. ***Patient D.W.*:**   On or around January 9, 2014, EPC conducted an ABI test on Medicare beneficiary D.W.

        i. D.W.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for an ABI test.

        ii. D.W.'s medical record indicated that the ABI test was "routine" and that it was a screening test.

        iii. EPC submitted a claim to Medicare for D.W.'s January 9, 2014 ABI test on or around February 19, 2014.

        iv. On or around February 22, 2014, Medicare reimbursed EPC for the January 9, 2014 ABI test in the amount of $63.59.

        v. If Medicare had known that the ABI test was not reasonable and necessary, it would not have reimbursed EPC for the test.

### *ANSAR tests*

252.    EPC used procedure codes 95921 and 95922 to bill Medicare for the ANSAR tests that it performed on its patients.

253.    EPC ordered the ANSAR test as a means to assess the credibility of his patients' complaints of pain rather than to address a specific medical problem.

254.    The following are some examples of claims submitted by EPC to Medicare for ANSAR tests that were not medically necessary:

    a. ***Patient E.A.*:**   On or around September 26, 2012, EPC performed ANSAR tests on Medicare beneficiary E.A.

    i.   E.A.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for the ANSAR test.

    ii.   EPC had performed ANSAR tests on E.A. on three prior occasions (on March 28, 2012; October 7, 2011; and June 13, 2011), all of which were reviewed by clinicians who did not note any abnormalities.

    iii.   The medical records indicated that E.A.'s ANSAR test on September 26, 2012 were "routine."

    iv.   The medical records indicated that the September 26, 2012 ANSAR test were incomplete.  There is no indication that the test were repeated.

    v.   EPC submitted a claim to Medicare for E.A.'s September 26, 2012 ANSAR test on or around September 27, 2012.

    vi.   On or around October 1, 2012, Medicare reimbursed EPC for the September 26, 2012 ANSAR tests in the amount of $141.43.

    vii.   If Medicare had known that the ANSAR test was not reasonable and necessary and, additionally, was never completed, it would not have reimbursed EPC for the tests.

b.   ***Patient J.T.:***   On or around February 5, 2013, EPC performed ANSAR tests on Medicare beneficiary J.T.

    i.   J.T's medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for the ANSAR tests.

ii. J.T. previously had ANSAR tests on August 14, 2012 and February 21, 2012.  The clinicians did not note any abnormalities on the August 14, 2012 test.  The February 21, 2012 test was never completed (although it was billed to and paid by Medicare).

iii. EPC submitted a claim to Medicare for J.T.'s February 5, 2013 ANSAR test on or around February 6, 2013.

iv. On or around February 9, 2013, Medicare reimbursed EPC for the February 5, 2013 ANSAR tests in the amount of $148.47.

v. If Medicare had known that the ANSAR test was not reasonable and necessary, it would not have reimbursed EPC for the test.

c. ***Patient A.B.***:   On or around July 9, 2012, EPC performed ANSAR tests on Medicare beneficiary A.B.

i. A.B's medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for the ANSAR tests.

ii. A.B. previously had ANSAR tests on May 17, 2010; October 4, 2010; March 21, 2011; August 8, 2011; and November 1, 2011.  The clinicians did not note any abnormalities on these earlier tests.

iii. The medical records described the July 9, 2012 ANSAR test as "routine."

iv. EPC submitted a claim to Medicare for A.B.'s July 9, 2012 ANSAR test on or around July 11, 2012.

v. On or around July 14, 2012, Medicare reimbursed EPC for the July 9, 2012 ANSAR tests in the amount of $141.43.

vi. If Medicare had known that the ANSAR test was not reasonable and necessary, it would not have reimbursed EPC for the test.

### *EKG tests*

255.    EPC used procedure code 93000 to bill Medicare for the EKG tests that it performed on its patients.

256.    EPC ordered the EKG tests as screening tests rather than to address a specific medical problem.

257.    The following are some examples of claims submitted by EPC to Medicare for EKG tests that were not medically necessary:

a.   ***Patient K.M.:***   On or around February 29, 2012, EPC conducted an EKG test on Medicare beneficiary K.M.

i.   K.M.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for the EKG test.

ii.   The medical records indicated that the EKG test was "routine."

iii.   EPC submitted a claim to Medicare for K.M.'s February 29, 2012 EKG test on or around March 1, 2012.

iv.   On or around March 5, 2012, Medicare reimbursed EPC for the February 29, 2012 EKG test in the amount of $23.91.

v.   If Medicare had known that the EKG test was not reasonable and necessary, it would not have reimbursed EPC for the test.

b.   ***Patient T.C.:***   On or around February 27, 2014, EPC conducted an EKG test on Medicare beneficiary T.C.

    i. T.C.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for an EKG test.

    ii. The medical records indicated that the EKG test was "routine."

    iii. EPC submitted a claim to Medicare for T.C.'s February 27, 2014 EKG test on or around February 28, 2014.

    iv. On or around March 5, 2014, Medicare reimbursed EPC for the February 27, 2014 EKG test in the amount of $12.36.

    v. If Medicare had known that the EKG test was not reasonable and necessary, it would not have reimbursed EPC for the test.

c. ***Patient R.A.***:   On or around October 11, 2013, EPC performed an EKG test on Medicare beneficiary R.A.

    i. R.A.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for the EKG test.

    ii. The medical records indicated that the test was "routine."

    iii. R.A. previously had EKG tests on March 1, 2013; September 14, 2012; July 26, 2011; the results of these tests were normal.

    iv. EPC submitted a claim to Medicare for R.A.'s October 11, 2013 EKG test on or around October 15, 2013.

    v. On or around October 23, 2013, Medicare reimbursed EPC for the October 11, 2013 EKG test in the amount of $13.42.

vi.  If Medicare had known that the EKG test was not reasonable and necessary, it would not have reimbursed EPC for the test.

***Sudoscan tests***

258.  EPC used procedure code 95923 to bill Medicare for the Sudoscan tests that it performed on its patients.

259.  EPC ordered the Sudoscan test as screening test rather than to address a specific medical problem.

260.  The following are some examples of claims submitted by EPC to Medicare for Sudoscan tests that were not medically necessary:

a.  ***Patient R.K.*:**   On or around April 8, 2014, EPC conducted a Sudoscan test on Medicare beneficiary R.K.

i.  R.K.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for the Sudoscan tests.  His neurological assessment was normal.

ii.  The medical records indicated that the April 8, 2014 Sudoscan test was "routine."

iii.  A letter dated April 9, 2014 from EPC to R.K. stated that the Sudoscan test performed on April 8, 2014 was a "screening exam."

iv.  EPC submitted a claim to Medicare for R.K.'s April 9, 2014 Sudoscan test on or around April 10, 2014.

v.  On or around April 23, 2014, Medicare reimbursed EPC for the April 8, 2014 Sudoscan test in the amount of $148.76.

     vi. If Medicare had known that the Sudoscan test was not reasonable and necessary, it would not have reimbursed EPC for the test.

b. ***Patient R.A.*:**   On or around November 8, 2013, EPC conducted a Sudoscan test on Medicare beneficiary R.A.

     i. R.A.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for the Sudoscan test.  His neurological assessment was normal.

     ii. The medical records indicated that the November 8, 2013 Sudoscan test was "routine."

     iii. A letter dated November 12, 2013 from EPC to R.A. stated that the Sudoscan test performed on November 8, 2013 was a "screening exam."

     iv. EPC had previously conducted a Sudoscan test on R.A. on March 1, 2013 and the results were normal.

     v. EPC submitted a claim to Medicare for R.A.'s November 8, 2013 Sudoscan test on or around November 12, 2013.

     vi. On or around November 15, 2013, Medicare reimbursed EPC for the November 8, 2013 Sudoscan test in the amount of $187.65.

     vii. If Medicare had known that the Sudoscan test was not reasonable and necessary, it would not have reimbursed EPC for the test.

c. ***Patient G.T.*:**   On or around December 7, 2012, EPC conducted a Sudoscan test on Medicare beneficiary G.T.

    i.  G.T.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for the Sudoscan test. His neurological assessment was normal.

    ii.  The medical records indicated that the December 7, 2012 Sudoscan test was "routine."

    iii.  A letter dated December 10, 2012 from EPC to G.T. stated that the December 7, 2012 Sudoscan test was a "screening exam."

    iv.  EPC submitted a claim to Medicare for G.T.'s December 7, 2012 Sudoscan test on or around December 10, 2012.

    v.  On or around December 13, 2012, Medicare reimbursed EPC for the December 7, 2012 Sudoscan test in the amount of $116.00.

    vi.  If Medicare had known that the Sudoscan test was not reasonable and necessary, it would not have reimbursed EPC for the test.

d.  ***Patient K.B.***:  On or around November 18, 2013, EPC conducted a Sudoscan test on Medicare beneficiary K.B.

    i.  K.B.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for the Sudoscan test. His neurological assessment was normal.

    ii.  The medical records indicated that the November 18, 2013 Sudoscan test was "routine."

    iii.  EPC previously billed Medicare for a Sudoscan test it claim to have performed on K.B. on March 1, 2013; however, there was no indication in the medical record that the March 1, 2013 test was performed.

iv. EPC submitted a claim to Medicare for K.B.'s November 18, 2013 Sudoscan test on or around November 19, 2013.

v. On or around November 22, 2013, Medicare reimbursed EPC for the November 18, 2013 Sudoscan test in the amount of $187.65.

vi. If Medicare had known that the Sudoscan test was not reasonable and necessary, it would not have reimbursed EPC for the test.

***Pharyngometer tests***

261.    EPC used procedure code 92520 to bill Medicare for the Pharyngometer tests that it performed on its patients.

262.    EPC ordered the Pharyngometer test as a screening test rather than to address a specific medical problem.

263.    The following are some examples of claims submitted by EPC to Medicare for Pharyngometer tests that were not medically necessary:

a. ***Patient A.P.***:   On or around December 4, 2012, EPC conducted a Pharyngometer test on Medicare beneficiary A.P.

i. A.P.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for the Pharyngometer test.

ii. The medical records indicated that the December 4, 2012 Pharyngometer test was "routine."

iii. EPC conducted a previous Pharyngometer test on A.P. on May 22, 2012 that produced results within normal limits.

    iv.  EPC submitted a claim to Medicare for A.P.'s December 4, 2012 Pharyngometer test on or around December 5, 2012.

    v.  On or around December 10, 2012, Medicare reimbursed EPC for the December 4, 2012 Pharyngometer test in the amount of $52.74.

    vi.  If Medicare had known that the Pharyngometer test was not reasonable and necessary, it would not have reimbursed EPC for the test.

b.  ***Patient E.K.***:   On or around October 17, 2012, EPC performed a Pharyngometer test on Medicare beneficiary E.K.

    i.  E.K.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for a Pharyngometer test.

    ii.  E.K. previously had a Pharyngometer test on March 2, 2012, and clinicians did not note any abnormalities.

    iii.  The medical records indicated that the October 17, 2012 Pharyngometer test was "routine."

    iv.  EPC submitted a claim to Medicare for E.K.'s October 17, 2012 Pharyngometer test on or around October 18, 2012.

    v.  On or around October 22, 2012, Medicare reimbursed EPC for the October 17, 2012 Pharyngometer test in the amount of $52.74.

    vi.  If Medicare had known that the Pharyngometer test was not reasonable and necessary, it would not have reimbursed EPC for the test.

c.  ***Patient C.W.***:   On or around December 17, 2012, EPC performed a Pharyngometer test on Medicare beneficiary C.W.

    i.  C.W.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for a Pharyngometer test.

    ii.  C.W. previously had a Pharyngometer test on April 9, 2012, and the clinicians did not note any abnormalities.

    iii.  The medical records indicated that the December 17, 2012 Pharyngometer test was "routine."

    iv.  EPC submitted a claim to Medicare for C.W.'s December 17, 2012 Pharyngometer test on or around December 17, 2012.

    v.  On or around December 20, 2012, Medicare reimbursed EPC for the December 17, 2012 Pharyngometer test in the amount of $52.74.

    vi.  If Medicare had known that the Pharyngometer test was not reasonable and necessary, it would not have reimbursed EPC for the test.

### *Vestibular Autorotation Tests (VAT)*

264.    EPC used procedure codes 92542, 92546, 92547 and 92270 to bill Medicare for the Vestibular Autorotation Test ("VAT") that it performed on its patients.

265.    EPC ordered the VAT as a screening test rather than to address a specific medical problem.

266.    The following are some examples of claims submitted by EPC to Medicare for VATs that were not medically necessary:

    a.  ***Patient R.F.*:**  On or around February 22, 2013, EPC conducted a VAT on Medicare beneficiary R.F.

    i.   R.F.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for the VAT.

    ii.   The medical records indicated that the VAT was never completed.

    iii.   The medical records did not contain any test results indicating that the VAT was performed on R.F. on February 22, 2013.

    iv.   On or around February 26, 2013, EPC submitted a claim to Medicare seeking reimbursement for a VAT that it supposedly performed for R.F. on February 22, 2013.

    v.   On or around March 1, 2013, Medicare reimbursed EPC for VAT that had supposedly taken place on February 22, 2013 in the amount of $172.21.

    vi.   If Medicare had known that the VAT had not been performed and/or was not reasonable and necessary, it would not have reimbursed EPC for the test.

b.  ***Patient B.J.***:   On or around June 7, 2012, EPC performed a VAT on Medicare beneficiary B.J.

    i.   B.J.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for the VAT.

    ii.   EPC submitted a claim to Medicare for B.J.'s June 7, 2012 VAT on or around June 11, 2012.

    iii.   On or around June 14, 2012, Medicare reimbursed EPC for the June 7, 2012 VAT in the amount of $107.66.

    iv.   If Medicare had known that the VAT was not reasonable and necessary, it would not have reimbursed EPC for the tests.

    c. ***Patient C.B.*:**   On or around February 21, 2012, EPC performed a VAT on Medicare beneficiary C.B.

        i. C.B.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for the VAT.

        ii. EPC submitted a claim to Medicare for C.B.'s February 21, 2012 VAT on or around February 23, 2012.

        iii. On or around February 27, 2012, Medicare reimbursed EPC for the February 21, 2012 VAT in the amount of $181.35.

        iv. If Medicare had known that the VAT was not reasonable and necessary, it would not have reimbursed EPC for the test.

### ***Bone Density Tests***

267.   EPC used procedure code 77080 to bill Medicare for bone density tests that it performed on its patients.

268.   EPC ordered the bone density tests as a screening test rather than to address a specific medical problem.

269.   The following are some examples of claims submitted by EPC to Medicare for bone density tests that were not medically necessary:

    a. ***Patient B.F.*:**   On or around February 18, 2014, EPC performed a bone density test on Medicare beneficiary B.F.

        i. B.F.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for a bone density test.

    ii.  EPC previously performed a bone density test on B.F. on February 21, 2012, and the results were normal.

    iii.  EPC described the February 18, 2014 test as "routine."

    iv.  EPC submitted a claim to Medicare for B.F.'s February 18, 2014 bone density test on or around February 19, 2014.

    v.  On or around February 22, 2014, Medicare reimbursed EPC for the February 18, 2014 bone density test in the amount of $44.28.

    vi.  If Medicare had known that the bone density test was not reasonable and necessary, it would not have reimbursed EPC for the test.

b.  ***<u>Patient B.B.</u>***:  On or around November 26, 2013, EPC performed a bone density test on Medicare beneficiary B.B.

    i.  B.B.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for a bone density test.

    ii.  EPC previously performed a bone density test on B.F. on November 8, 2011, and the results were normal.

    iii.  EPC described the November 26, 2013 bone density test as "routine."

    iv.  EPC submitted a claim to Medicare for B.B.'s November 26, 2013 bone density test on or around November 27, 2013.

    v.  On or around December 2, 2013, Medicare reimbursed EPC for the November 26, 2013 bone density test in the amount of $45.01.

    vi.  If Medicare had known that the bone density test was not reasonable and necessary, it would not have reimbursed EPC for the test.

    c. **_Patient S.B._:**   On or around October 18, 2013, EPC performed a bone density test on Medicare beneficiary S.B.

        i. S.B.'s medical record did not document the presence of signs, symptoms, complaints or a medical history indicating medical necessity for a bone density test.

        ii. EPC previously performed a bone density test on S.B. on October 20, 2011, and the results were normal.

        iii. EPC described the October 18, 2013 bone density test as "routine."

        iv. EPC submitted a claim to Medicare for S.B.'s October 18, 2013 bone density test on or around October 22, 2013.

        v. On or around October 25, 2013, Medicare reimbursed EPC for the October 18, 2013 bone density test in the amount of $45.01.

        vi. If Medicare had known that the bone density test was not reasonable and necessary, it would not have reimbursed EPC for the test.

**_Failure to use test results in care of patient_**:

270.   Medicare only reimburses for tests if the treating physician (or qualified non-physician practitioner) uses the test results in the management of the beneficiary's specific medical problem.  *See* 42 C.F.R. § 410.32.

271.   Once EPC conducted the ancillary tests on its Medicare beneficiaries, it failed to incorporate the results into the beneficiary's plan of care.

272.   The following are examples of claims that EPC submitted for tests that it failed to use in the medical management of the beneficiary:

a.  On November 9, 2012, EPC conducted an ANSAR test on Medicare beneficiary B.C.  The test came back with abnormal results; however, EPC did not take any action to address these abnormal result with B.C.  Nonetheless, EPC submitted a claim to Medicare for the test on or around November 13, 2012, and was reimbursed by Medicare for the test on or around November 16, 2012 in the amount of $141.43.

b.  On December 28, 2012, EPC conducted an ANSAR test on Medicare beneficiary L.M.  The test came back with abnormal results; however, EPC did not take any action to address these abnormal results with L.M.  Nonetheless, EPC submitted a claim to Medicare for the test on or around January 3, 2013, and was reimbursed by Medicare for the test on or around January 7, 2013 in the amount of $141.43.

c.  On July 29, 2013, EPC conducted a VAT on Medicare beneficiary R.G. even though EPC intended to discharge him for having filled narcotic prescriptions from multiple doctors and had canceled all of his future appointments.  The VAT test results were not reviewed by the physician until after R.G. had been discharged.  In other words, EPC could not have intended to use these test results in R.G.'s medical care.  Nonetheless, EPC submitted a claim to Medicare for VAT on or around July 31, 2013, and was reimbursed by Medicare for the VAT on or around August 3, 2013 in the amount of $168.78.

273.  EPC's submission of claims to Medicare that for tests that it failed to use in the management of the beneficiary's care rendered the claims nonreimbursable.

274.  If Medicare had known that EPC was not using the results of the ancillary tests in the care and management of the beneficiary, it would not have reimbursed EPC for the tests.

275.    Ellis was aware of the fact that EPC was not incorporating the results of the ancillary tests in the management of the care of its patients, including those who were Medicare beneficiaries.

## COUNT I
### FCA: Presentation of False Claims
### (31 U.S.C. § 3729(a)(1) and (a)(1)(A))

276.    The United States repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

277.    As detailed above, Defendants presented, or caused to be presented, materially false and fraudulent claims for payment or approval to the United States, including claims for reimbursement by the Medicare Program, that were false and fraudulent because, among other things, they were for services for that were never rendered and/or were not medically necessary.

278.    As detailed above, the Medicare Program would not have reimbursed EPC for these false and fraudulent claims had they known that the services were never rendered or were not medically necessary.

279.    Defendants presented or caused to be presented these claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

280.    Defendants are liable to the United States for damages in an amount to be determined at trial, but not less than $9 million in single damages, trebled, as well as a minimum civil penalty to the United States of $5,500 and up to a maximum penalty of $11,000 for each false claim presented or caused to be presented prior to November 2, 2015, and a minimum civil penalty of $11,181 to a maximum penalty of $22,363 for claims after November 2, 2015.

## COUNT II
### FCA: Using False Statements to Get False Claims Paid
### (31 U.S.C. § 3729(a)(1)(B))

281.    The United States repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

282.    As detailed above, Defendants made, used, or caused to be made or used, false records or statements, which included the false certifications and representations on the CMS-1500 as well as the EDI enrollment and applications, to obtain approval for and payment by the United States for false or fraudulent claims as detailed above.

283.    Defendants' false certifications and representations were made for the purpose of ensuring that the Medicare Program paid the false or fraudulent claims, which was a reasonable and foreseeable consequence of Defendants' statements and actions.

284.    The false certifications and representations made or caused to be made by Defendants were material to the payment of the false claims by the United States.

285.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

286.    Defendants are liable to the United States for damages in an amount to be determined at trial,  but not less than $9 million, trebled, as well as a minimum civil penalty to the United States of $5,500 and up to a maximum penalty of $11,000 for each false claim presented or caused to be presented prior to November 2, 2015, and a minimum civil penalty of $11,181 to a maximum penalty of $22,363 for claims after November 2, 2015 to the present.

## COUNT III
### FCA: False Record Material to Obligation to Pay
### (31 U.S.C. § 3729(a)(1)(G))

287.    The United States repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

288.    As detailed above, Defendants made, used, or caused to be made or used, false records or statements material to obligations to pay or transmit money to the United States, or concealed, improperly avoided or decreased obligations to pay or transmit money to the United States.

289.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

290.    Defendants are liable to the United States for damages in an amount to be determined at trial, but not less than $9 million, trebled, as well as a minimum civil penalty of $5,500 and up to a maximum penalty of $11,000 for each false claim presented or caused to be presented prior to November 2, 2015, and a minimum civil penalty to the United States of $11,181 to a maximum penalty of $22,363 for claims after November 2, 2015 to the present.

## COUNT IV
### FCA: Reverse False Claim Against Ellis, Allen, EPC
### (31 U.S.C. § 3729(a)(7))

291.    The United States repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

292.    Defendants Ellis, Allen and EPC made or used, or caused to be made or used, false records and statements to conceal, avoid, or decrease an obligation to pay or transmit money to the United States with respect to claims submitted for urine drug testing and ancillary testing being billed fraudulently in violation of 31 U.S.C. § 3729(a)(7).

293.     Said concealment and avoidance was done with actual knowledge of the refund or payment obligations, or with reckless disregard or in deliberate ignorance of these obligations.

294.     Because of the unlawful conduct of Ellis, Allen and EPC, the United States is entitled to damages in an amount to be determined at trial, but not less than $9 million, trebled, as well as a minimum civil penalty to the United States of $5,500 and up to a maximum penalty of $11,000 for each false claim presented or caused to be presented prior to November 2, 2015, and a minimum civil penalty of $11,181 to a maximum penalty of $22,363 for claims after November 2, 2015 to the present.

## COUNT V
### Payment by Mistake

295.     The United States repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

296.     The United States paid Defendants, either directly or indirectly, for claims submitted by EPC for services that were (i) never rendered and/or (ii) not medically necessary, without knowledge of material facts, and under the mistaken belief that Defendants were entitled to receive payment for such claims.

297.     The mistaken belief of the United States was material to its decision to pay Defendants on such claims.

298.     The United States reasonably relied on EPC's submission of claims that they believed were accurate, complete, and truthful, in accordance with the express requirements of Medicare.

299.     The United States has been damaged as a result of these mistaken payments, and Defendants are thus liable to account and pay to the United States such amounts, which are to be determined at trial.

## COUNT VII
**Unjust Enrichment**

300.     The United States repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

301.     By retaining monies and profits received from services that were not reimbursable, Defendants retained money that was the property of Medicare to which they were not entitled.

302.     The United States seeks the recovery of all funds paid by Medicare by which Defendants have been unjustly enriched, including profits unlawfully earned from urine testing at EPC's lab, claims for nonreimbursable ancillary testing, and other amounts paid based on claims for services that were medically unnecessary or for services not rendered or not accurately described.

303.     EPM, being owned and operated by Ellis and Allen, was unjustly enriched at the expense of the United States as the recipient of revenues from EPC that were known by EPM to arise from Ellis, Allen, and EPC's improper and fraudulent activities as alleged herein.

304.     As a consequence of the acts set forth above, Defendants were unjustly enriched at the expense of the United States in an amount to be determined and which, under the circumstances, in equity and good conscience, should be returned to the United States.

## COUNT VIII
**Common Law Fraud**

305.     The United States repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

306.     As set forth in detail above, from 2012 through 2015, Defendants made numerous material false statements to the United States to obtain money from Medicare to which they were not entitled.

307.   Defendants knew or should have known about the fraudulent conduct at EPC.

308.   Defendants also failed to tell Medicare about the fraudulent activity at EPC, which was a material omission.

309.   Defendants made such material false statements and omissions with the intent that the United States would rely on them in making determinations to pay claims submitted to Medicare.

310.   The United States reasonably relied on Defendants' material misrepresentations and omissions.

311.   The United States was injured as a result of Defendants' unlawful conduct in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

Wherefore, the United States demands that judgment be entered in its favor and against Defendants jointly and severally as follows:

1)   On Counts One, Two, Three and Four against all Defendants for violation of the FCA with the amount of damages trebled and such penalties as required by law, together with all such further relief as may be just and proper.

2)   On Count Five against all Defendants, the amounts Medicare mistakenly paid EPC and, indirectly, Ellis, Allen and EPM, to which they were not entitled, plus interest, costs and expenses, together with all such further relief as may be just and proper.

3)   On Count Six against all Defendants, the amount by which Defendants were unjustly enriched or retained monies received from reimbursements paid by the United States to which they were not entitled, plus interest, costs and expenses, together with all such further relief as may be just and proper.

4)      On Count Seven for common law fraud against all Defendants, the amounts they fraudulently obtained from Medicare plus interest, costs, and expenses, together with all such further relief as may be just and proper.

5)      All other relief as may be required or authorized by law and in the interests of justice.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States demands a trial by jury on all issues so triable.

Respectfully submitted,

For the United States:

CHARLES PEELER
United States Attorney
Middle District of Georgia

BY:   ***/s/Todd P. Swanson***
Assistant United States Attorney
Georgia Bar No. 496989
E. Bowen Reichert Shoemaker
Assistant United States Attorney
Georgia Bar No. 222443
P.O. Box 1702
Macon, Georgia 31202-1702
Tel:  (478) 621-2728
Fax:  (478) 621-2737
Email:  todd.swanson@usdoj.gov
Email:  bowen.shoemaker@usdoj.gov

BY:   ***/s/Neeli Ben-David*[2]**
Assistant United States Attorney
Georgia Bar No. 049788
600 U.S. Courthouse
75 Ted Turner Drive, S.W.
Atlanta, Georgia 30303
Tel:  (404) 581-6303
Fax:  (404) 481-4667
Email: neeli.ben-david@usdoj.gov

---

[2]Ms. Ben-David is an Assistant United States Attorney from the Northern District of Georgia who has been appointed to serve as a Special Assistant United States Attorney for the Middle District of Georgia in this case.